IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:18-CT-03199-M

| | | |
|---|---|---|
| JERMAL BACOTE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| SERGEANT DILLARD, et al., | ) | |
| | ) | |
| Defendants. | ) | |

This cause is before the court for consideration of plaintiff's motions for summary judgment [D.E. 44, 53], plaintiff's motion for default judgment [D.E. 52], and defendants' motion for summary judgment [D.E. 47]. These motions are ripe for review.

Statement of the Case:

On August 2, 2018, Jermal Bacote ("plaintiff"), a state inmate proceeding *pro se* and without prepayment of fees, filed this complaint under 42 U.S.C. § 1983. See [D.E. 1, 2, 7].

Plaintiff generally alleges that, at the Central Prison Emergency Room ("ER") on February 7, 2017, Sergeant Dillard ("Dillard"), Correctional Officer Hale ("Hale"), and Correctional Officer Copeland ("Copeland"), violated plaintiff's constitutional rights when they kicked and punched him while he was in full restraints, resulting in injuries to his neck, back, shoulder, nose, and face. See Compl. [D.E. 1] at 3–7. Plaintiff seeks compensatory and punitive damages. Id. at 8.

On February 20, 2019, the court conducted its initial review under 28 U.S.C. § 1915 and allowed the action to proceed. Order [D.E. 9].

On April 29, 2019, Dillard and Hale filed Waivers of Service [D.E. 13].[1] After an extension of time, Order [D.E. 17], the remaining defendants, Dillard and Hale (collectively, "defendants"), timely filed their answer on July 24, 2019, see [D.E. 22].

On August 8, 2019, the court appointed North Carolina Prisoner Legal Services, Inc. ("NCPLS") for the limited purpose of assisting plaintiff with discovery. See Order [D.E. 26].

On September 12, 2019, the court set the deadline for completion of discovery as February 10, 2020, and the deadline for filing dispositive motions as March 10, 2020. Order [D.E. 27].

On January 8, 2020, this case was reassigned to the undersigned judge via a text order.

On January 15, 2020, defendants filed a consent motion seeking an extension of the deadlines. Mot. [D.E. 35]. On January 16, 2020, the court granted the motion, setting an April 10, 2020, discovery deadline, and a May 11, 2020, dispositive motion deadline. Order [D.E. 36].

On March 24, 2020, pursuant to Standing Order 20-SO-1, plaintiff filed through NCPLS counsel a response that NCPLS would not provide further representation. See [D.E. 37].

On May 6, 2020, plaintiff moved *pro se* to extend the motions deadline. Mot. [D.E. 38]. The court granted the motion, setting a new motions deadline of June 11, 2020. Order [D.E. 39].

On June 10, 2020, defendants moved to extend the motions deadline. Mot. [D.E. 40]. The court granted the motion, setting a new motions deadline of August 10, 2020. Order [D.E. 41].

On July 16, 2020, plaintiff filed a motion for summary judgment. Mot. [D.E. 44].

On August 5, 2020, defendants filed a motion for an extension of time to file dispositive motions and a motion for an extension of time to file a response to plaintiff's pending motion for

---

[1] Because defendant Copeland was longer an employee of North Carolina Department of Public Safety ("DPS"), an executed waiver could not be obtained for him. [D.E. 14]. Summons as to Copeland twice were issued and returned unexecuted. See [D.E. 15, 18, 20, 24]. The court then dismissed the claims against Copland without prejudice for failure to complete service. Order [D.E. 30].

2

summary judgment. Mot. [D.E. 45]. Also on that date, the court granted defendants' motion, setting both the dispositive motions and response deadline as October 9, 2020. Order [D.E. 46].

On October 9, 2020, defendants filed a motion for summary judgment, Mot. [D.E. 47], a memorandum in support, [D.E. 48], a statement of material facts, [D.E. 49], and an appendix to the statement of material facts [D.E. 50].

Pursuant to Roseboro v. Garrison, 528 F.2d 309, 310 (4th Cir. 1975) (per curiam), the court notified plaintiff about the motion for summary judgment, the consequences of failing to respond, and the response deadline [D.E. 51].

On October 19, 2020, plaintiff filed a motion for entry of default.[2] Mot. [D.E. 52].

On October 30, 2020, plaintiff filed a motion for summary judgment, Mot. [D.E. 53], a memorandum in support, [D.E. 54], a declaration, [D.E. 55], opposition to defendants' statement of material facts [D.E. 56], and an appendix [D.E. 57].

Statement of Facts:

The facts are substantially disputed. Plaintiff alleges that, while he was in full restraints at the Central Prison ER: Dillard closed the curtain to his ER bed; Dillard, Copeland, and Hale "formed a line in front of [him]"; Dillard punched him in the face and Copeland and Hale punched him; Dillard, Copeland, and Hale pushed him off the bed and then kicked him "in the face, head, back, chest while also punching [plaintiff] all over [his] body"; and that Dillard, Hale, and Copeland picked him up and "placed [him] back on the bed and left [him] with another officer."

---

[2] An entry of default shall be made when "a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend." Fed. R. Civ. P. 55(a). In support of this motion, plaintiff argues that defendants failed to file a response in opposition to plaintiff's motion for summary judgment by the response deadline of October 9, 2020. Mot. [D.E. 52] at 1. Plaintiff simply is incorrect. See Defs.' Mem. [D.E. 48] at 1 (entitled "defendants' memorandum of law (i) in support of their motion for summary judgment and (ii) *in opposition to plaintiff's motion for summary judgment*" (emphasis added)). Accordingly, the court DENIES this motion [D.E. 52].

3

Compl. [D.E. 1] at 6. Plaintiff asserts he suffered: scars on his wrist due to the cuffs; a "busted nose" that was knocked out of line; a swollen face; injuries to his shoulder; and nerve injuries in his back and neck. Id. at 5–7. Plaintiff further alleges that: he was taken to a hospital for x-rays; he was not provided "anything for pain"; and that, he submitted sick-call requests "due to being in extreme pain yet they refuse to treat me or even acknowledge my sick calls." Id. at 7.

Defendants, by contrast, state: On February 7, 2017, at approximately 12:45 a.m., after a different altercation for which plaintiff required medical attention, plaintiff was escorted by defendant Dillard to bed #6 in the urgent care unit at Central Prison.[3] Defs.' Stmt. Mat. Facts [D.E. 49] at ¶¶5–6. The parties disagree as to the circumstances of defendant Hale's arrival and whether plaintiff attempted to kick Dillard.[4] See id. at ¶¶7–10. A scuffle ensued, but the parties

---

[3] Plaintiff declares that: on February 6, 2017, "after an altercation on Unit-3 Death Row, [he] was handcuffed behind [his] back by Sgt. Bobby Pruitt . . . helped to [his] feet and escorted off the unit . . . to Central Prison Urgent Care"; plaintiff "was placed in a holding cell by the X-ray area"; plaintiff had been sprayed with pepper spray but had not been decontaminated; Sgt. Pruitt placed plaintiff "in full restraints with the black box behind [his] back and leg chains where I posed no threat to anyone in full waist chains [sic]"; plaintiff then was "moved to from the emergency side to the x-ray side" an area that was "heavily guarded with about ten (10) officers"; and "L.T. S. Milland walked to the entrance of the x-ray area and nodded his head to the officers who were standing guard at the holding cell [and] with that signal[,] [plaintiff] was then escorted back to the emergency (ER) side to the last stall." Pl.'s Decl. [D.E. 55] at ¶¶2–4. Defendant Dillard declares: "On February 7, 2017, at approximately 12:45 a.m., another officer and I escorted the Plaintiff to bed #6 in the urgent care unit of Central Prison. He needed to be assisted by a nurse after an altercation with another offender." Defs.' App., Ex. 1, Declaration of James Dillard ("Dillard Decl.") [D.E. 50-1] at ¶4. Publicly available information reflects that, on February 6, 2017, plaintiff was cited for various prison disciplinary infractions including weapon possession, assault staff with a weapon, and substance possession, and that, on February 7, 2017, plaintiff was cited for an Attempted Class A Offense. See N.C. Dep't of Pub. Safety, Offender Pub. Info. https://webapps.doc.state.nc.us/opi/viewoffenderinfractions.do?method=view&offenderID=0796623&listpage=1&listurl=pagelistoffendersearchresults&searchOffenderId=0796623&searchDOBRange=0&obscure=Y (Feb. 25, 2021).

[4] Plaintiff declares: Hale, Dillard, and Copeland were already waiting in the "stall" when plaintiff arrived; as he sat on the bed, "the officers lined up and stepped forward making a tight wall"; Dillard took his right hand and pulled the curtain closed as plaintiff sat in full restraints. Pl.'s Decl. [D.E. 55] at ¶¶5–7. Defendant Hale declares that: "On February 7, 2017, I was dispatched to bed #6 in the urgent care unit of Central Prison where the Plaintiff was located. I understood that the Plaintiff needed to be assessed by a nurse after an altercation with another offender"; and that, as Hale approached, plaintiff was seated on the bed, and Hale observed plaintiff attempt to kick Dillard. Defs.' App., Ex. 2, Declaration of Nicholas Hale ("Hale Decl.") [D.E. 50-6] at ¶¶ 2–3. Dillard declares: "While the Plaintiff was in the bed, he attempted to kick me, but he did not make contact with me." Dillard Decl. [D.E. 50-1] at ¶5. In his opposition to defendants' statement of material facts, plaintiff appears to dispute his ability to kick, stating that, because plaintiff was in full restraints with leg chains, he was prevented from raising one foot without the other foot also being raised. See Pl.'s Opp'n to Defs.' Stmt. Of Facts [D.E. 56] at ¶1.

4

disagree as to the nature of the altercation and whether plaintiff "fell to the floor with defendants" or was pushed to the floor by the defendants.[5] See id. at ¶¶11–12. The parties also disagree how officers took control of plaintiff.[6] See id. at ¶¶13–15. The parties further disagree if plaintiff was given an order to stop resisting, and whether Dillard applied a bent wrist technique to plaintiff's wrist.[7] See id. at ¶¶16–18. Plaintiff then was returned to the bed.[8] Id. at ¶¶19–20. A nurse completed an assessment of plaintiff.[9] Id. at ¶21. Plaintiff then was transported to an

---

[5] Plaintiff declares that, while he was fully restrained, Dillard, Copeland, and Hale "began to beat [him], punching [him] repeatedly in the face and body area to which [he] was pushed to the floor [sic]" and "kicked [him] in the face, shoulder, and body area repeatedly." Pl.'s Decl. [D.E. 55] at ¶¶8–9. Hale declares plaintiff lunged at Hale and that plaintiff, Hale, and Dillard all "fell to the floor together." Hale Decl. [D.E. 50-6] at ¶¶4–5; accord Dillard Decl. [D.E. 50-1] at ¶¶6–7. Plaintiff, by contrast, states that, "plaintiff didn't fall to the floor with defendants. Plaintiff was knocked to the floor from the beating from defendants [sic]." Pl.'s Opp'n to Defs.' Stmt. Of Facts [D.E. 56] at ¶2.

[6] Hale and Dillard declare that Hale took control of plaintiff's right arm, Dillard took control of plaintiff's upper body, a third officer took control of plaintiff's left arm, and a fourth officer took control of the handcuffs on plaintiff's wrist. Hale Decl. [D.E. 50-6] at ¶¶6–8; Dillard Decl. [D.E. 50-1] at ¶¶8–10. Plaintiff: "refutes" that officers took control of his arms; states, "plaintiff was in full restraints, in handcuffs locked in a black box behind his back"; and asserts he wasn't handcuffed in the front because "any use of force done on offender the offender will automatically be handcuffed in back locked in black box [sic]. Pl.'s Opp'n to Defs.' Stmt. Of Facts [D.E. 56] at ¶¶3–4.

[7] Dillard and Hale declare that: Dillard ordered plaintiff to stop resisting but he continued to resist; Dillard then applied a bent wrist technique on plaintiff and plaintiff complied with the order to stop resisting; Hale and another officer then brought plaintiff "back to his feet and placed him back on the bed without incident"; and, once plaintiff "was placed back on his bed, he no longer posed a threat to [Dillard] or the other officers, and all force was ceased." Dillard Decl. [D.E. 50-1] at ¶¶11–15; Hale Decl. [D.E. 50-6] at ¶¶9–13. Without elaboration, plaintiff "refutes" defendants' statement that Dillard ordered him to stop resisting, but he continued to resist. Pl.'s Opp'n to Defs.' Stmt. Of Facts [D.E. 56] at ¶5. Plaintiff also "refutes" that Dillard applied the bent wrist technique, asserting that it is "impossible to use bent wrist technique" when offenders are handcuffed and locked in a black box behind their backs. Id. at ¶6.

[8] Without elaboration, plaintiff "refutes" these statements. See Pl.'s Opp'n to Defs.' Stmt. Of Facts [D.E. 56] at ¶7. Plaintiff declares he was "picked up and placed back on the bed still in full restraints." Pl.'s Decl. [D.E. 55] at ¶9.

[9] Without elaboration, plaintiff "refutes" this statement. Pl.'s Opp'n to Defs.' Stmt. Of Facts [D.E. 56] at ¶7. Plaintiff declares: "I was assaulted while still covered with OC pepper spray and hours passed before I was finally cleaned up to have photos taken and seen by a nurse with my attackers gone." Pl.'s Decl. [D.E. 55] at ¶10. The record reflects a Feb. 7, 2017, Central Prison clinical encounter at 12:55 a.m. See Pl.'s App. [D.E. 57-1] at 15 (note by Uchechukwu Okam, RN, stating: "patient was seen at the urgent following an altercation with custody, patient arrived with bruises to the forehead and dry blood to nostrils deformed. Patient states headache and blurred vision. Denies any loss of consciousness. Fully alert and oriented. Able to ambulate with a steady gait. Bleeding controlled."); id. at 16 (note by Mohammed Kahn, MD, stating: plaintiff "is brought from unit after involvement with fighting other inmates and officers. He complains of headache and blurred vision. Denies any loss of consciousness. On examination Deformed nasal bridge with bleeding which has stopped. Ecchymosis all over . . . extremities range of motion intact . . . . Assessment and plan: Altercation, headache rule out head injury plan-send to Wake Med emergency room.").

5

outside Hospital.[10] The parties disagree whether defendants or other officers closed the curtain around plaintiff's bed and "attacked" plaintiff.[11] See id. at ¶¶22–23. The parties also disagree whether defendants' use of force was appropriate or excessive,[12] and whether defendants' use of force complied with DPS policies and procedures,[13] and whether plaintiff had prior conflicts with the defendants.[14] See id. at ¶¶24–33.

---

[10] Plaintiff declares: "my injuries I sustained were so severe that I had to be transported to outside hospital (Rex Hospital)." Pl.'s Decl. [D.E. 55] at ¶11. A Feb. 7, 2017, Rex Hospital ER report at 4:36 a.m. notes: chief complaint of head pain; history of present injury, "the patient purportedly assaulted a prison guard, when other prison guards arrived to control the patient, he sustained injury to his head. He had no [loss of consciousness]. He reports pain in the left side of his head and neck. He denies paresthesia or weakness. He has no nausea. He is ambulatory without difficulty"; vitals taken at 3:13 a.m. and 4:51 a.m.; review of systems noting, *inter alia*, no chest pain but positive for skin injury; physical examination noting, *inter alia*, no acute distress, conversing comfortably, normal work of breathing, normal range of motion in his neck, no midline vertebral tenderness, a non-tender abdomen, wrist abrasions at site of handcuffs, no gross deformity of extremities; CT scan of plaintiff's head, indicated for "left-side headache after trauma," with an impression of "a small left frontal scalp hematoma" but otherwise normal CT of the brain. See Pl.'s Mot. Attach. [D.E. 44-1] at 51–52. The record also reflects a February 7, 2017, clinical encounter at Central Prison at 6:45 a.m. noting that: plaintiff returned from an outside hospital "after evaluated for altercation, alert and fully oriented, ambulatory, no visible injury noted. Inmate denies headache or visual changes." Id. at 62.

[11] Compare Compl. [D.E. 1] at 6 (alleging Dillard closed the ER bed curtain and that Dillard, Hale, and Copeland then attacked plaintiff), and Pl.'s Opp'n to Defs.' Stmt. Of Facts [D.E. 56] at ¶7 (stating plaintiff "especially" refutes defendants' statement at ¶23 because "Sgt. Dillard did pull the curtain"), and Pl.'s Decl. [D.E. 55] at ¶7 ("Dillard took his right hand and pulled the curtain closed as [plaintiff] sat in full restraints"), with Dillard Decl. [D.E. 50-1] at ¶¶17–18 (declaring: "at no time did I or any other officer attack the Plaintiff," and "at no time did I or any other officer close the curtain around the Plaintiff's bed."); and Hale Decl. [D.E. 50-6] at ¶¶15–16 (declaring: "at no time did I or any other officer attack the Plaintiff," and "at no time did I or any other officer close the curtain around the Plaintiff's bed."); and [D.E. 44-1] at 26 (witness statement from Nurse Okam stating: plaintiff was brought to Urgent Care on Feb. 7, 2017, at approximately 12:45 a.m. for medical screening; plaintiff was taken to the back treatment room; and "I did not observe[] or witness any staff assaulting [plaintiff].").

[12] Dillard and Hale both declares that all officers' use of hands-on force "was appropriate under the circumstances, and not at all excessive, in order to bring plaintiff into compliance with [Dillard's] direct orders and to restore discipline." Dillard Decl. [D.E. 50-1] at ¶20; accord Hale Decl. [D.E. 50-6] at ¶18. Plaintiff "refutes" these statements "because defendants are not being truthful with this court–plaintiff just didn't sustain a deformed nose and bloody face just from a fall to the floor. In fact, the investigation officer stated he didn't know how plaintiff sustained injuries." Pl.'s Opp'n to Defs.' Stmt. Of Facts [D.E. 56] at ¶8.

[13] Defendants declare they are familiar with DPS Use of Force Policy and Procedures and Central Prison Use of Force, Standard Operating Procedure, and their actions on Feb. 7, 2017, complied with these policies. Dillard Decl. [D.E. 50-1] at ¶¶24–26; Hale Decl. [D.E. 50-6] at ¶¶22–24. Plaintiff "refutes" these statements, asserting he has shown that defendants' use of force did not comply with policy. See Pl.'s Opp'n to Defs.' Stmt. Of Facts [D.E. 56] at ¶9.

[14] Hale declares: "I had no confrontations or verbal disagreements with the Plaintiff prior to this incident." Hale Decl. [D.E. 50-6] at ¶25. Plaintiff, by contrast, states that "plaintiff has had previous verbal confrontation with defendant Hale in front of kitchen here at central prison [sic]." Pl.'s Opp'n to Defs.' Stmt. Of Facts [D.E. 56] at ¶10.

6

Legal Standard:

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment must initially demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, see Anderson, 477 U.S. at 247–48, but "must come forward with specific facts showing that there is a genuine issue for trial," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). In making this determination whether a genuine issue of material fact exists for trial, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. See Scott v. Harris, 550 U.S. 372, 378 (2007). "When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Rules of Civil Procedure." Desmond v. PNGI Charles Town Gaming, L.L.C., 630 F.3d 351, 354 (4th Cir. 2011).

Discussion:

The Eighth Amendment "prohibits the infliction of 'cruel and unusual punishments' on those convicted of crimes." Wilson v. Seiter, 501 U.S. 294, 296–97 (1991) (internal citation omitted). An inmate's Eighth Amendment excessive-force claim requires a plaintiff to show that "the officials act[ed] with a sufficiently culpable state of mind," and that "the alleged wrongdoing was objectively harmful enough to establish a constitutional violation." Hudson v. McMillian,

503 U.S. 1, 8 (1992) (quotations and alteration omitted). "The core judicial inquiry . . . [is] not whether a certain quantum of injury was sustained, but rather whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Wilkins v. Gaddy, 559 U.S. 34, 37 (2010) (per curiam) (quotations omitted). "[T]he 'state of mind required is wantonness in the infliction of pain.'" Brooks v. Johnson, 924 F.3d 104, 112 (4th Cir. 2019) (citation omitted). Factors for whether an officer acted wantonly include: "(1) 'the need for the application of force'; (2) 'the relationship between the need and the amount of force that was used'; (3) the extent of any reasonably perceived threat that the application of force was intended to quell; and (4) 'any efforts made to temper the severity of a forceful response.'" Iko v. Shreve, 535 F.3d 225, 239 (4th Cir. 2008) (noting that the factors outlined in Whitley v. Albers, 475 U.S. 312, 321 (1986) ("Whitley"), apply "to all allegations of excessive force").

The court presumes, without deciding, that plaintiff's alleged injuries satisfy the objective component of an excessive-force claim. See Iko v. Shreve, 535 F.3d at 238 (noting even a "minor" injury can be actionable if it "rises above the level of *de minimus* harm").

Turning to the "subjective prong" of the Eighth Amendment inquiry, plaintiff declares that defendants: were waiting for him in the ER "stall"; closed the bed curtain; lined up; and, although he was fully restrained, deliberately punched and kicked plaintiff repeatedly. See Pl.'s Decl. [D.E. 55] at ¶¶5–9. Defendants, by contrast, declare that: they did not close the bed curtain or attack plaintiff; they used force only to bring plaintiff into compliance with lawful orders and restore discipline; and their use-of-force was not excessive under the circumstances. See Dillard Decl. [D.E. 50-1] at ¶¶17–18, 20, 24–26; Hale Decl. [D.E. 50-6] at ¶¶15–16, 18, 22–24. These disparate sworn statements as to defendants' subjective intent cannot be reconciled.

8

After viewing the evidence and the inferences drawn therefrom in the light most favorable the nonmoving party, see Scott 550 U.S. at 378, issues of material fact preclude entry of summary judgment for either plaintiff or defendants, see Anderson, 477 U.S. at 247–48.

Although defendants also contend that qualified immunity insulates them from suit, see Defs.' Mem. [D.E. 48] at 13–14, because there are genuine issues of material fact as to whether defendants' use-of-force violated plaintiff's Eighth Amendment rights, the record precludes a finding of qualified immunity on summary judgment. See Tolan v. Cotton, 134 S. Ct. 1861, 1865–66 (2014). On a more fully developed record, defendants may reassert this defense.

Conclusion:

For the reasons discussed above, the court: DENIES plaintiff's motion for entry of default [D.E. 52]; DENIES defendants' motion for summary judgment [D.E. 47]; and DENIES plaintiff's motions for summary judgment [D.E. 44, 53]. The court REFERS the case to United States Magistrate Judge Robert B. Jones, Jr. for a court-hosted settlement conference. Judge Jones will notify the parties how he wishes to proceed concerning the settlement conference, and the date on which it will be held. The court also APPOINTS North Carolina Prisoner Legal Services, Inc. ("NCPLS") for the limited purpose of assisting plaintiff in the court-hosted settlement conference. See Standing Order 20-SO-1 at ¶8.

SO ORDERED, this 1st day of March 2021.

Richard E Myers II
RICHARD E. MYERS II
Chief United States District Judge